**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROSALYN RIVERA ROLON,** | : | **Civil No. 1:20-CV-00800** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **ANDREW SAUL** | : | |
| **Social Security Commissioner,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.    Introduction

Disability determinations often involve evaluation of a claimant's changing medical condition over time. One critical aspect of this analysis is ensuring that material changes in the claimant's health are fully and adequately considered. Where a material change in the claimant's health is not acknowledged or evaluated a remand is often necessary. This is particularly true in cases where the ALJ relies upon a medical opinion issued at an earlier stage in the disability evaluation process without considering how later developments may have undermined those initial medical opinions and assessments.

So it is here.

1

In the instant case, an ALJ denied a disability application submitted by Rosalyn Rivera Rolon. Rolon now appeals the ALJ's denial of her disability application, in which the ALJ found that Rolon could perform a range of sedentary work with some additional postural limitations. Specifically, the ALJ found that Rolon could perform sedentary work but was limited to only occasionally stooping, crouching, crawling, kneeling, squatting or climbing ramps and stairs; but could never climb ladders, ropes or scaffolds. The ALJ reached this conclusion even though the medical records indicated Rolon suffers from avascular necrosis in her right foot, and was required to undergo two surgeries in 2018 which left her dependent on an assistive device for ambulation.

We view this as a case in which there was a material change in Rolon's health following the collapse of the navicular bone in Rolon's right foot due to avascular necrosis and the surgeries which Rolon was required to undergo to address this condition.[1] In our view, the ALJ's decision did not adequately consider, analyze or address this material change in Rolon's physical condition. Thus, after a review of the record, including the extensive medical history regarding two separate foot

---

[1] Avasular necrosis is the pathologic death of one or more cells, or of a portion of tissue or organ resulting from irreversible damage; resulting from deficient oxygen supply. Stedman's Medical Dictionary, 28th Edition; Lippincott, Williams and Wilkins Pub.

surgeries and Rolon's use of a rolling walker and cane at the direction of hospital staff, we find that the ALJ's RFC determination is not supported by substantial evidence. Accordingly, since this material change in Rolon's physical condition was not sufficiently addressed by the ALJ we will order that this case be remanded for further consideration.

## II.    **Factual Background**

### A. **Rolon's Medical History**

Ms. Rolon filed for disability insurance benefits and for supplemental security income on July 20, 2017. (Tr. 12, 189-95, 196-205). She was 39 years old as of the alleged onset date of September 1, 2012 and had a high school education and past work as a child monitor/babysitter. (Tr. 22, 89, 97). Rolon alleged impairments of inflammatory polyarthritis, fibromyalgia, undifferentiated connective tissue disorder, obstructive sleep apnea, depression, swelling in legs, unable to stand, and unable to use hands and arms.  (Tr. 218).

In April of 2018, Rolon was treated for foot pain in her right foot which was diagnosed to be a reoccurrence and worsening of avascular necrosis, which had remained asymptomatic from 2015 through 2018. (Tr. 864). Dr. Overholt at Wellspan Health Orthopedics found that "[t]here is significant deformity of the navicular bone or collapse" and opined that a referral should be made to a foot and

3

ankle specialist at Hershey Medical Center. (Id.) On June 14, 2018, it was noted that post-surgery Rolon was able to wear only a post-op shoe, and that her situation was improved some but she required a referral to a specialist at Hersey Medical Center, as "she may need some type of resection and fusion secondary to her avascular necrosis." (Tr. 866-67).

On July 22, 2018 Rolon was referred to Good Samaritan Hospital Physical Therapy to undergo therapy. (Tr. 1046-47). Treatment notes noted that MRI showed a collapsed bone and that surgery was scheduled for August 21, 2018. (Tr. 1048). An assessment of her functional limitations indicated that she had moderate limitations, but that her limitations "will be severe after surgery." (Tr. 1047). Her prognosis was listed as fair, and it was noted that "the reality of using a walker for [non-weightbearing] is questionable" given her upper extremity limitations. (Id.) It was noted that Rolon needed assistance with her activities of daily living, assistance with homemaking, and assistance with dressing. (Tr. 1048). The treatment notes also indicated that Rolon underwent instruction and training on how to stand with the use of a rolling walker with a noted goal for Rolon to gain the ability to walk with the use of a rolling walker. (Tr. 1050).

An August 2, 2018 note indicates that hospital staff transferred Rolon from a car to a wheelchair for visits. (Tr. 1072). It was noted that Rolon was capable of

transfer from a wheelchair to car or bed with rolling walker or no device; did not tolerate ambulation with a rolling walker while not weight bearing on right lower extremity, but was able to tolerate partial weight bearing and use of a rolling walker. (Tr. 1074). At an August 3, 2018 physical therapy appointment, Rolon questioned whether she would be able to use a scooter or walker due to pain in her shoulders and knees. (Tr. 1083). On August 7, 2018 it was noted that Rolon would be given a scooter that day and a wheelchair in the future. (Tr. 1097). On August 14, 2018, physical therapists were attempting to train Rolon in good tolerance and safe use of a knee scooter. (Tr. 1113).

Hershey Medical Center records indicate that on August 31, 2018, Rolon underwent a right excision navicular triple arthorodesis, calcaneal bone grafting and naviculoceneform fusion. (Tr. 1253). It was noted that prior to the procedure, Rolon was capable of walking slowly with a cane with only 1-3 METS functional capacity. (Id.) The operative report indicates a preoperative diagnosis of right hindfoot and mid foot arthritis, pes planovalgus, Mueller-Weiss syndrome, and Achilles contracture, with an identical post-operative diagnosis. (Tr. 1289). The following procedures were performed: right subtalar fusion; right talonavicular fusion; right navicular cuneiform fusion of the medial and lateral navicular cuneiform joints; iliac crest bone grafting, right iliac crest; and percutaneous tendo-Achilles lengthening.

(Id.) Hersey Medical Center records indicate that post-surgery, Rolon ambulated with the use of a walker. (Tr. 1168).

Rolon was admitted to a nursing facility post-surgery while her children were cared for by her mother. (Tr. 1199). As of September 29, 2018, she remained in the nursing facility where it was noted that Rolon remained on Toe Touch Weight Bearing. (Tr. 1193). These treatment notes also indicated that Rolon's activities of daily living had decreased due to her pain and inability to complete these activities without assistance of a wheelchair. (Id.) Notes from Hersey Medical Center indicate that on October 11, 2018 Rolon appeared at follow-up appointment complaining of pain and swelling in the foot, which was "worse in dependent position." (Tr. 1232). A treatment note from October 25, 2018 noted an x-ray that indicated a possible ankle fracture. (Tr. 1225). This note also stated that Rolon had fallen about a week after her surgery, which made her pain worse. (Id.) An x-ray of the foot taken at Hersey Medical Center on November 20, 2018 indicated that osteonecrosis of the navicular with fracture remained unchanged and that there was diffuse soft tissue swelling in the foot. (Tr. 1224).

In addition to this objective medical evidence concerning Rolon's foot pain, medical opinions were rendered both prior to and subsequent to the onset of Rolon's recurrence of avascular necrosis. Thus, in August of 2017, Carla Huitt, M.D.,

performed an internal medicine examination of Rolon at the request of the Commissioner, prior to the onset of the reoccurrence of avascular necrosis. (Tr. 648). Dr. Huitt diagnosed Rolon with morbid obesity, undifferentiated connective tissue disease, obstructive sleep apnea, history of fibromyalgia, and status post arthroscopic surgery to the right shoulder and left knee. (Tr. 648-662). It was noted that Rolon's activities of daily living consisted of cooking, cleaning, going to church, and was able to dress herself without assistance. (Tr. 649). Dr. Huitt opined that Rolon was capable of standing and walking for a total of two hours in an eight hour day, but was capable of occasionally lifting and carrying up to 50 pounds. (Tr. 654).

On September 13, 2017 state agency consultative examiner, Michael Brown, D.O., performed a physical residual functional capacity assessment. (Tr. 103-05). Dr. Brown opined that Rolon could lift and carry up to 10 pounds frequently and up to 20 pounds occasionally, could sit for 6 hours or more and could walk and stand for up to 4 hours each an average workday. (Id.) Dr. Brown's assessment included a notation that Rolon did not require an assistive device to ambulate. (Tr. 105).

Following Rolon's diagnosis of avascular necrosis, in January of 2019, Dr. Sowmya Surapaneni, M.D., a rheumatologist who treated Rolon for fibromyalgia in the relevant period, opined that Rolon would have mild to moderate functional limitations but would be expected to be absent from work four days per month,

would be expected to be off task from work 20% of the time, would require up to 3 unscheduled 10 minute work breaks per day; and would require the ability to elevate her legs at waist level 40% of the workday. (Tr. 1492-1497). This was the only opinion rendered subsequent to the onset of Rolon's recurrence of avascular necrosis.

At the administrative hearing in January of 2019, Rolon testified that she was placed in ManorCare, a rehabilitation center, and that her wounds were healing and looking good but that she was released from ManorCare in October. (Tr. 54-55). She reported that she had been given a scooter and then a wheelchair because she was not weight bearing. (Tr. 55). She was using a rolling walker at the time of the hearing, and her doctor, who she would see again in March, had told her that she could start putting pressure on it while using the walker and would be able to eventually use a cane. (Tr. 55-56). Rolon stated that she was not able to wear her shoes and was only able to wear slippers due to the swelling in her foot. (Tr. 58). She testified that she would try to make meals for her children but that her foot would swell and that she would need to use a bariatric walker which allowed her to sit. (Tr. 58-59). Rolon further testified that prior to the surgery she used a cane to walk. (Tr. 59). Throughout the hearing, the ALJ and Rolon's attorney asked questions regarding functioning with a reference to her activity "prior to the surgery." Rolon

testified that prior to the surgery, she would elevate her feet but that after the surgery she was told to elevate them at heart level. (Tr. 73-76).

A Vocational Expert ("VE") also testified at the administrative hearing. The ALJ posed a hypothetical to the VE, which asked the expert to identify jobs that an individual of the claimant's age, education and past work history could perform with the following limitations:

> For the first hypothetical I want you to consider an individual with the same age, education, past work as the claimant who is capable of the following: lift and/or carry 20 pounds occasionally, 10 pounds frequently; can sit six hours; can stand or walk four hours each per eight-hour day; occasional postural but no ladders, ropes or scaffolds.

(Tr. 83). The ALJ asked a second hypothetical, with the only difference being a sedentary limitation. (Tr. 84).

Thus, the ALJ's hypothetical questions to the expert did not make any reference to Rolon's use of an assistive device or the necessity to elevate her feet at waist level. (Id.) However, when the plaintiff's counsel asked the expert whether these jobs would allow for an individual to raise their feet to waist level, as Rolon stated is required and as Dr. Surapaneni stated was required to alleviate swelling in Rolon's right foot, and required the use of a roller to ambulate, the expert testified that there would be no jobs for such a hypothetical individual. (Tr. 86).

It was against this backdrop that the ALJ issued a decision denying Rolon's claim.

## B. **The ALJ's Decision**

Rolon applied for disability insurance benefits and supplemental security income on May 30, 2017, alleging an onset date of September 1, 2012. (Tr. 12). Her initial applications for benefits were denied on September 14, 2017. (Tr. 111-15, 116-20). Thereafter, Rolon requested a hearing on November 3, 2017. (Tr. 127-28). A hearing was held on January 14, 2019. (Tr. 12). At the hearing, both Rolon and a Vocational Expert testified. (Id.) By a decision dated March 12, 2019, the ALJ denied Rolon's application for benefits. (Tr. 12-23).

At the outset, the ALJ first concluded that Rolon met the insured status requirements of the Social Security Act through June 30, 2015, and that she had not engaged in any substantial gainful activity since her alleged onset date of disability, September 1, 2012. (Tr. 14). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Rolon had the following severe impairments: degenerative joint disease, obesity, and fibromyalgia. (Id.) The ALJ also noted that the plaintiff's asthma and sleep apnea did not meet the criteria for a severe impairment. (Tr. 14-15). The ALJ found that Rolon suffered from avascular necrosis

of the right foot, which was asymptomatic from July 2015 through April of 2018, but noted that:

> In 2018, the claimant's records showed her to have some progressive changes but was noted within a few months to demonstrate significant improvement in her pain with surgical intervention and the use of a post-op shoe (Exhibit 8F, page 10). Though the claimant was noted as unable to use a regular shoe, her records suggested little evidence of any functional loss with use of her prescribed post-op shoe. (Exhibit 8F, page 11).

(Tr. 15). Accordingly, the ALJ found the plaintiff's avascular necrosis to be a nonsevere impairment. (Id.) The ALJ also found that Rolon's depression was nonsevere. (Tr. 18). At Step 3, the ALJ found that none of Rolon's impairments met or medically equaled a listed impairment. (Id.)

Between Steps 3 and 4, the ALJ fashioned a residual functioning capacity ("RFC"), taking into account Rolon's limitations from her impairments:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). However, the claimant can only occasionally perform all postural activities, except that the claimant can never climb ladders, ropes, or scaffolds.

(Tr. 17).

Specifically, in making this RFC determination, the ALJ found the opinion of Dr. Huitt to be persuasive. (Tr. 20). The ALJ reasoned that Dr. Huitt's opinion was consistent with her own clinical findings and observations, which found no evidence

11

of a sensory deficit, impaired gait, diminished strength, or evidence of muscle atrophy. (Id.) The ALJ further stated that Dr. Huitt's opinion was consistent with the 2019 opinion of Dr. Surapaneni to the extent that opinion showed that Rolon could work at a sedentary level. (Id.)

The ALJ found Dr. Surapaneni's opinion persuasive to the extent that she opined Rolon could engage in sedentary work but not persuasive in that Dr. Surapaneni opined that Rolon would be absent for 4 days a month, off task for 20% of the day, or required to elevate her leg for 40% of the day. (Id.) The ALJ opined that these limitations were inherently inconsistent with the level of sedentary work that Dr. Surapaneni stated Rolon could perform, including her need for breaks and to elevate her legs. (Id.) Notably, the ALJ further reasoned that Dr. Surapaneni's additional restrictions were unsupported by the longitudinal treatment records and history of routine and conservative treatment. (Id.) Significantly, there is no mention of Rolon's two surgeries that she underwent in 2018 for her avascular necrosis, or any mention of how those surgeries affected this residual functional capacity assessment, particularly given that the treatment records indicated Rolon required the assistance of a walker or wheelchair prior to and following her August 2018 surgery. Indeed, as we have noted, treatment records through November of 2018 indicated that Rolon required the use of an assistive device to ambulate.

The ALJ further found the opinion of state agency consultant Dr. Brown persuasive, noting that Dr. Brown's opinion was consistent with the medical record and was based on his expert evaluation of the medical issues. (Tr. 20-21). The ALJ reasoned that although there was medical evidence submitted after Dr. Brown rendered his opinion, the new evidence did not demonstrate a significant decline in Rolon's functioning. (Tr. 21). Again, and significantly, we note that there is no discussion concerning Rolon's surgeries or her post-operative pain and functional limitations, which occurred after Dr. Brown rendered his opinion in 2017.

Thus, at Step 4, the ALJ found that Rolon could not perform her past relevant work as a child monitor (Tr. 22), but found at Step 5 that there were jobs in the national economy that Rolon could perform, including an information clerk, credit clerk, and product inspector. (Tr. 22-23). Accordingly, the ALJ determined that Rolon was not disabled and denied her claim for benefits. (Tr. 23). Rolon requested a review of the ALJ's decision, which was denied by the Appeals Council. (Tr. 1-6). This appeal followed. (Doc. 1).

On appeal, Rolon contends that the ALJ's decision is not based on substantial evidence as required under 42 U.S.C. § 405(g) because the ALJ erred in finding Rolon's right foot avascular necrosis and migraines nonsevere at step 2; erred in his consideration of Rolon's morbid obesity; erred in failing to consider Rolon's need

for an assistive device; and erred in failing to comply with SSR 96-8; and that the Appeals Council erred in failing to consider new evidence. (Doc. 18, at 5). For the reasons set forth below, we agree and find that the ALJ erred in finding Rolon's right foot avascular necrosis nonsevere at step 2 and, in turn, erred in failing to consider the limiting effects of this impairment and Rolon's need for the use of an assistive device in his RFC determination. Accordingly, we will order that the ALJ's decision be vacated and the case be remanded to the Commissioner for further proceedings.

## III.   Discussion

### A.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence." )(alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Title II or Title XVI of the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.  §423(d)(1)(A);  42  U.S.C.  §1382c(a)(3)(A);  <u>see also</u>  20  C.F.R. §§404.1505(a), 416.905(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.    42  U.S.C.  §423(d)(2)(A);  42  U.S.C.  §1382c(a)(3)(B);  20  C.F.R. §§404.1505(a), 416.905(a).  To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the

18

physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in

19

the factual setting where a well-supported medical source has opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and

20

recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

On this score, as we have noted when evaluating medical opinions which form the basis of an RFC determination:

> [C]ase law also cautions courts to take into account the fact that state agency non-treating and non-examining source opinions are often issued at an early stage of the administrative process. While this fact, standing alone, does not preclude consideration of the agency doctor's opinion, see Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011), it introduces another level of caution that should be applied when evaluating reliance upon such opinions to discount treating and examining source medical statements. Therefore, where a state agency non-treating and non-examining opinion does not take into account material medical developments which have occurred after the opinion was rendered, that opinion often cannot be relied upon by the Commissioner to carry its burden of proof. See Batdorf v. Colvin, 206 F. Supp. 3d 1012, 1023 (M.D. Pa. 2016).

Dieter v. Saul, No. 1:19-CV-1081, 2020 WL 2839087, at *7 (M.D. Pa. June 1, 2020).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work

experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id</u>. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir. 1999).

## C. <u>Legal Benchmarks for the ALJ's Step Two Finding Whether a Condition is Severe</u>

At Step 2 of the sequential analysis, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). An impairment is considered severe if it "significantly limits an individual's physical or

22

mental abilities to do basic work activities. 20 C.F.R. 404.1520(c). Moreover, an impairment is severe if it is "something beyond a 'slight abnormality which would have no more than a minimal effect on the Plaintiff's ability to do basic work activities.'" McCrea v. Comm'r of Soc. Sec., 370 F.3d at 357, 360 (3d Cir. 2004) (quoting SSR 85-28, 1985 WL 56856 (1985)). The Court of Appeals is clear that the step-two inquiry is a *de minimis* screening device used to cast out meritless claims. McCrea, 370 F.3d at 360; Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003). The burden, while not an exacting one, is on the claimant to show that an impairment qualifies as severe. Bowen, 482 U.S. at 146, 107 S.Ct. 2287; Stancavage v. Saul, 469 F. Supp. 3d 311, 331 (M.D. Pa. 2020).

### D. This Case Should Be Remanded for Further Consideration and Articulation of the Grounds for the ALJ's Decision.

As we have noted, it is axiomatic that an ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Furthermore, the ALJ must also "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck, 181 F.3d at 433. Here we find that the ALJ failed to address the medical evidence as it pertains to Rolon's second surgery and her necessity for an assistive device to ambulate subsequent to her onset of right foot avascular necrosis in April 2018.

Moreover, the ALJ has failed to resolve several inconsistencies in the record which contradict his residual functional capacity assessment.

At the outset, we find that Rolon has clearly met the burden to show that her right foot avascular necrosis had more than a minimal effect on her ability to do work activity. She underwent two separate surgeries for the condition, one of which was a complex triple arthrodesis that required her to spend more than a month recovering in a rehabilitative care center. (Tr. 1199, 1289). Further, Rolon was required to undergo months of physical therapy both prior to and after the surgery, to use a wheelchair and be non-weightbearing for several months, and to ambulate thereafter with the use of a rolling walker. (Tr. 996-1061, 1097, 1113, 1168).

Indeed, the ALJ's finding—that Rolon's records suggest that her condition improved within months of its onset in April 2018 and that her records showed no suggestion of a functional loss—is contradicted by the very exhibit and very page numbers that he cites for support. The ALJ specifically states that Exhibit 8F at pages 10-11 notes that Rolon's pain improved after her first surgery and that she was able to return to normal function with a post-op shoe. (Tr. 15). However, it is noted on those exact pages that while Rolon's situation had improved, she required a referral to a specialist at Hershey Medical Center, as "she may need some type of resection and fusion secondary to her avascular necrosis." (Tr. 866-67). In fact, as we have

explained, Rolon underwent a second surgery in August 2018. Accordingly, a finding that Rolon's pain was improved but that her foot remained too swollen to fit into a anything but a post-op shoe, and that she likely needed to be referred to a specialist for a second surgery, cannot possibly be as characterized by the ALJ, a finding that there was "little evidence of functional loss."

On this score, the Commissioner argues that Rolon failed to prove that the wheelchair, walker, or scooter were "medically required" as set forth in 96-9p. The Commissioner points to a lack of a prescription and additionally points to the ALJ's recitation of Dr. Huitt's findings that Rolon "walked slowly and did not require the use of a cane." (Doc. 19, at 17-18). However, we find the Commissioner's argument is unpersuasive.

First, while there is no "prescription" that was presented prior to the surgery, inpatient hospital records established that the hospital outfitted Rolon with a scooter and walker and sent her for physical therapy to be properly instructed in their use, advising her not to bear weight on her foot and to use them for all ambulation. (Tr. 1097, 1113.). This clearly meets the requirements to show that the devices were medical necessary. See SSR 96-9p ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the

circumstances for which it is needed"). Additionally, the findings of Dr. Huitt were made in 2017, prior to the collapse of Rolon's navicular bone in April 2018 due to avascular necrosis. Thus, while Dr. Huitt's finding might be supportive of a finding for the period prior to April 2018, that opinion does not, and cannot, be considered persuasive in light of the subsequent material changes in Rolon's condition. Likewise, the opinion of the state agency expert Dr. Brown which the ALJ also found persuasive pre-dated this August 2018 decline in her health. Therefore, that opinion did not, and could not take into account what appears to have been a subsequent material change in Rolon's health. In evaluating these opinions the ALJ did not address how these subsequent medical developments may have undermined the persuasiveness of the opinions. In fact, as we have noted, the ALJ failed to mention anything regarding Rolon's avascular necrosis after April of 2018, when the medical record shows her condition substantially changed and declined.

Given the considerable evidence regarding the subsequent need for additional surgery and the use of a rolling walker, we cannot find that the ALJ's finding at Step 2 was supported by substantial evidence as it pertains to the treatment of Rolon's necrosis, particularly after 2018. Nor can we agree with the Commissioner's argument that any error at Step 2 was harmless error. The Commissioner argues that pursuant to Salles v. Comm'r of Soc. Sec. 229 F. App'x 140, 145 n.2 (3d 2007) and

Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) it is harmless error for an ALJ not to find an impairment nonsevere at Step 2 if he or she continues past Step 2. (Doc. 19, at 11). However, those cases hold that such an error is harmless as long as the ALJ ultimately accounts for *all* impairments in the final RFC, including those that are nonsevere. As we have explained, that did not happen here, as the ALJ failed to account for the limitations caused by this impairment, including the use of an assistive device. Moreover, the ALJ did not explain his reasoning for discounting the evidence of Rolon's avascular necrosis in 2018, including the evidence showing that Rolon needed an assistive device to ambulate. Furthermore, the ALJ's reliance upon the opinions of Dr. Huitt and Dr. Brown in making this disability determination does not take into account material medical developments which occurred after the opinions were rendered. As a result these medical opinions cannot be relied upon by the Commissioner to carry its burden of proof, particularly as it relates to Rolon's medical condition after 2018. See Dieter v. Saul, No. 1:19-CV-1081, 2020 WL 2839087, at *7 (M.D. Pa. June 1, 2020); Batdorf v. Colvin, 206 F. Supp. 3d 1012, 1023 (M.D. Pa. 2016).

Accordingly, we conclude that the ALJ's RFC determination is not supported by an adequate explanation. The ALJ determined that Rolon could perform a range of sedentary work with certain limitations, including occasional postural limitations

and the ability to stand and walk for up to 2 hours in an eight-hour day. (Tr. 17). In making this determination, however, the ALJ failed to address the medical evidence indicating that Rolon had a second surgery and thereafter was both hospitalized and placed in a rehabilitative treatment center, and released with directions to bear weight on her foot only with the use of a walker. Moreover, the ALJ failed to explain why he discounted this evidence, or how it was inconsistent with the other medical evidence and opinions.

On this record, we cannot find that the ALJ's decision is based upon substantial evidence. Accordingly, we will remand the case for further consideration by the Commissioner. Because the Court has found a basis for remand on these grounds, we need not address Rolon's remaining arguments. To the extent that any other error occurred, it may be remedied on remand. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.    <u>CONCLUSION</u>

Accordingly, IT IS ORDERED that Rolon's request for a new administrative hearing should be GRANTED, the final decision of the Commissioner denying these

claims is VACATED, and this case is remanded to the Commissioner to conduct a new administrative hearing pursuant to sentence four of 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

Submitted this 24th day of May, 2021.

/S/ Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge